Filed 6/25/26

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| In re N.J., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, Plaintiff and Respondent, v. A.J., Defendant and Appellant. | E086829 (Super.Ct.No. DPRI2500210) OPINION |

APPEAL from the Superior Court of Riverside County. Walter H. Kubelun, Judge. Affirmed in part, vacated in part with directions.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant.

Mihn C. Tran, County Counsel, Jamila T. Purnell, Chief Assistant County Counsel, and Prabhath Shettigar, Deputy County Counsel, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.B., II.C., II.D., and II.E.

1

A.J. (Father) appeals from the juvenile court's dispositional findings and orders concerning his minor daughter, N.J., and challenges those findings on numerous grounds. Father also argues that the juvenile court erred by not making an express finding that he is N.J.'s presumed Father. Finally, Father argues that the juvenile court and the Riverside County Department of Public Social Services (DPSS) failed to comply with the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.) and related California statutes.

We agree with Father regarding ICWA and the presumed father finding. Where the juvenile court did not expressly find a father to be a presumed father but treated him as one, we hold that the court implicitly made that finding. We accordingly vacate the juvenile court's ICWA finding and remand the matter for the court to ensure compliance with ICWA and related California statutes. We also direct the court to make explicit its implicit finding of Father's presumed father status to alleviate any confusion regarding Father's rights as a presumed father. We otherwise affirm.

## I.

## FACTUAL AND PROCEDURAL HISTORY

A. *The Initial Referral and Investigation*

In May 2025, DPSS received an emergency referral reporting that A.B. (Mother) gave birth to Z.P. (male), who tested positive for methamphetamine. Mother tested positive for methamphetamine and marijuana. At the time of the referral, Mother was living with Z.P.'s father and three children: Ar.B. (female, born in 2011), Am.B. (female,

born in 2013), and N.J. (female, born in 2022) who is Father's only child with Mother. This appeal only involves N.J. and Father.

A social worker responded to the referral and met with Mother, Z.P.'s father, Ar.B., Am.B., and N.J. at the hospital. N.J. was two and one-half years old and appeared healthy, playful, and bonded to her family. The social worker interviewed Mother in the presence of the children's maternal grandmother and maternal aunt. Mother reported that she was diagnosed with depression and was previously prescribed psychotropic medication but denied needing support at this time. Mother admitted that she had a history of smoking marijuana but denied ever using methamphetamine. She admitted smoking marijuana about five or six times in the last month of her pregnancy, including within the last week, and speculated the marijuana could have been laced with methamphetamine. Regarding Father, Mother stated he is N.J.'s biological father and is listed on the birth certificate. Father last visited N.J. six months earlier, on Thanksgiving in 2024. According to Mother, Father attempted to abscond with N.J. during that visit, so "she does not allow [Father] to come around [N.J.]." Mother was unaware of Father's whereabouts or his contact information. DPSS was therefore unable to locate Father.

B. *Detention Hearing*

Shortly after the initial referral, all four children were detained pursuant to a protective custody warrant and DPSS filed a petition under Welfare and Institutions Code[1] section 300 alleging risk of serious physical harm and failure to provide support.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

The petition made two allegations against Father. First, it alleged that N.J. was at risk of serious physical harm under subdivision (b)(1) of section 300 (section 300(b)(1)) because Father "is not a member of [N.J.'s] household and he fails to maintain contact and/or provide [N.J.] with adequate food, clothing, shelter, medical treatment and protection." Second, it alleged under subdivision (g) of section 300 (section 300(g)) that because Father's whereabouts were unknown, "he has failed to make himself available to provide the child, [N.J.], with care, supervision and support."

At the detention hearing, after a prima facie finding, the court detained all four children from Mother and detained N.J. from Father. Father did not appear at the hearing, and DPSS could not locate him. Ar.B., Am.B. and N.J. were placed together in the same foster home.

C. *Jurisdiction/Disposition Report*

In June 2025, after locating and interviewing Father, DPSS filed its jurisdiction/disposition (JD) report. According to the JD report, DPSS discovered that Father lived out of state with N.J.'s paternal grandmother, paternal uncle, and Father's nine-year-old daughter. Father confirmed that he is N.J.'s biological father, was present when she was born in December 2022, and is listed on her birth certificate. Father ended the relationship with Mother in October 2023 and left "before she got violent." Father admitted that "he has not been in the home for more than one year."

The JD report also discussed Father and Mother's prior dependency history involving N.J. In January 2024, DPSS received a general neglect referral concerning N.J.

4

and her half siblings, who were living with Mother and Father. Mother, who had lost weight, was seen outside the children's school and appeared to be on drugs. DPSS concluded that the referral was unfounded. In October 2024, DPSS received an additional general neglect referral concerning Mother from school officials. Father apparently informed school officials that "he was no longer in the home and had attempted to contact Mother but was unable to get [a hold] of her." He also informed the school officials that there had been prior child welfare reports and that Mother was using drugs.

Father was also interviewed about the allegations in the petition. Regarding Moher's substance use, Father said, "Wow. She lied to me." He recalled that Mother "got skinny" when he saw N.J. but Mother told Father that she had lost weight because "she had an ulcer and was dying." Father spoke with one of Mother's family members who told him that Mother "was on drugs and doing meth." Father told the social worker: "[T]hat is when I knew it was true. I found out the truth. The whole time she was lying she had cancer and an ulcer. She lost a lot of weight."

Regarding the section 300(b)(1) allegation against him, Father stated: "I stayed away from [Mother] because she was crazy. I stayed away, I didn't want to risk my well-being, freedom." With respect to the section 300(g) allegation, Father stated that Mother "was the one who disappeared on me. When I found out she was doing drugs. She took off."

5

Father relayed he wanted custody of N.J. and was ready to take N.J. with him to his home out of state. He stated, "I want her with me. I think she's better with me than anyone else. I am her dad, I will take care of her. Her mom kept her away from me. I called the cops, welfare checks . . . . When I tried to get help, you thought I was lying. You guys made it seem. [Mother] kept getting away with it. I was hoping this would happen. You can tell someone you do this or do that, but until you guys catch them that is what it is." (Italics omitted.)

According to the JD report, a social worker interviewed then 13-year-old Ar.B. and 12-year-old Am.B. Ar.B. told the social worker that N.J. did not see Father and did not know when he last visited. Am.B. told the social worker that N.J. was Ar.B.'s "baby" and described Ar.B. and N.J. as "very close." Am.B. said that Ar.B. "takes care of" N.J. Ar.B. said that sometimes N.J. "will come to her bed at night," which did "not bother her."

The caregiver for Ar.B., Am.B., and N.J. reported that N.J. "is very close with her sisters [Ar.B. and Am.B.] and will often cry if they just leave the room." A social worker confirmed that Ar.B. and Am.B. are "very bonded with their younger sister [N.J] and brother [Z.P.]." The social worker witnessed N.J. "become emotionally upset just when the sisters [Ar.B. and Am.B.] walked into another room with" the social worker.

DPSS recommended that it would not be in N.J.'s best interest to move N.J. from placement with her half siblings to an out-of-state location with Father in part because N.J. is bonded to her half sisters. DPSS believed that N.J. would suffer emotional harm if

removed from placement with Ar.B. and Am.B. Given that Father had not lived with N.J. for over one year, DPSS recommended that Father establish a relationship with N.J. before considering placement.

D. *Jurisdiction/Disposition Hearing*

The court held the JD hearing in mid-June 2025. Father made his first appearance and was appointed counsel. Father's counsel did not ask the court to find that Father was N.J.'s presumed father. At the parties' agreement, the court continued the hearing to August 2025.

In August 2025, DPSS filed an addendum report for the continued hearing. Ar.B., Am.B., and N.J. remained placed together in the same foster home in which they were placed in May 2025 and Z.P. joined them in July 2025. Father contacted DPSS twice after the June 2025 hearing. He was upset about the JD report and demanded that N.J. be placed in his home immediately. DPSS believed that Father's placement request indicated that he "had no regard for [N.J.] and how this type of change could impact her."

DPSS thereafter filed an amended petition striking the allegation that Father was not a member of N.J.'s household under section 300(b)(1) and also striking the section 300(g) allegation against Father. The amended petition's sole allegation against Father was that he "fails to maintain contact and/or provide the child, [N.J.], with adequate food, clothing, shelter, medical treatment and protection." Allegations against Mother were unchanged.

At the continued JD hearing, Father, through his counsel, denied the allegation against him and requested N.J. be placed with him as a noncustodial parent who "had nothing to do" with the juvenile court involvement. Opposing Father's request, counsel for N.J. and DPSS argued, among other things, that it would not be in N.J.'s best interest to be separated from her half siblings, with whom she was very bonded. N.J.'s counsel argued that placement with Father would be detrimental to N.J.'s safety and emotional well-being given the absence of a relationship with Father and N.J.'s bond with her half siblings. Mother's counsel agreed with the comments made by counsel for DPSS and N.J.

The juvenile court sustained the section 300(b)(1) allegations against both parents and adjudged N.J. a dependent of the court. The court found that there was clear and convincing evidence to remove N.J. from both parents under section 361, subdivision (c)(1). The court additionally found by clear and convincing evidence that placing N.J. with Father, whom the court described as noncustodial, would be detrimental to the safety, protection, or physical or emotional well-being of N.J. The court reasoned that placing N.J. with Father would "be detrimental for the reasons stated on the record by minor's Counsel to remove [N.J.] from her siblings at this point in time." The court explained that it had to consider N.J.'s safety and well-being, "including the potential emotional harm of not only moving [N.J.] to another state in a foreign home, but she is bonded to the older sister, [Ar.B.], and will even cry when [Ar.B.] is simply in a different

8

room, and looks to [Ar.B.] for comfort." The court ordered reunification services for Father and ordered DPSS to assess Father "and his home for the benefit of [N.J.]."

E.    *Facts Related to ICWA*

DPSS inquired about Indian ancestry in its first interview with Mother and maternal grandmother; both denied Indian ancestry. DPSS spoke with a maternal aunt who was also present during the interview with Mother, but the record does not reflect that the maternal aunt was asked about Indian Ancestry.

DPSS indicated that it completed its inquiry by asking Mother about N.J.'s Indian status in the Indian Child Inquiry Attachment form (ICWA-010(A)) to the petition. The form does not indicate that DPSS questioned any additional persons at the time the petition was filed.

At the detention hearing, the court made inquiry regarding Native American ancestry. Mother again reported she does not have Native American ancestry in her background. The court stated on the record that the parents present at the hearing were provided with the Parental Notification of Indian Status form (ICWA-020) and ordered the parents to complete and submit the form before leaving the courthouse. The court found after hearing from all parties there is no reason to believe or reason to know the children are Indian children and ICWA does not apply. The court noted that Father's whereabouts are unknown and further investigation is needed regarding whether N.J. is an Indian child.

Once located and upon inquiry by DPSS, Father denied any Indian ancestry or tribal heritage. Father reported living with paternal grandmother and paternal uncle, but the record does not reflect that DPSS inquired of these individuals about possible Indian ancestry or tribal heritage.

At the JD hearing, the court made further inquiry regarding Native American or Indian ancestry; Mother and Father denied Indian ancestry. The court stated "[a]fter hearing from all parents present, at this point in time, Court believes that ICWA does not apply. [DPSS] is to continue investigation, if necessary, for obtaining further information." The court found "there is no reason to believe or reason to know the child is an Indian child and ICWA does not apply."

## II.

### DISCUSSION

Father asserts the juvenile court erred by failing to make an explicit finding of his presumed father status affecting his constitutionally protected interests as N.J.'s parent. Father also contends that the jurisdictional finding against him that N.J. is at risk of serious physical harm under section 300(b)(1) is unsupported by substantial evidence. Father further contends the juvenile court committed reversible error when it applied section 361, subdivision (c)(1) that only applies to custodial parents which Father is not. Finally, Father correctly asserts, and DPSS concedes, that ICWA procedure was not followed.

10

A. *Juvenile Court Implicitly Found Presumed Father Status*

Father argues that while the juvenile court treated Father as the presumed father, it erred by not expressly making that finding. We agree that the record is absent an explicit finding, however, the court made an implicit finding by treating Father as N.J.'s presumed father. We therefore direct the court to make an express finding that Father is N.J.'s presumed father.

We review a juvenile court's determination of presumed father status for substantial evidence. (*In re Spencer W.* (1996) 48 Cal.App.4th 1647, 1652-1653.)

The Uniform Parentage Act (UPA) (Fam. Code, § 7600 et seq.) provides the statutory framework for judicial determinations of parentage. (*Elisa B. v. Superior Court* (2005) 37 Cal.4th 108, 116.) The UPA distinguishes among three categories of father including an alleged father, a biological father, and a presumed father. (*In re D.A.* (2012) 204 Cal.App.4th 811, 824.) "An unwed father's rights and duties under the UPA substantially depend on whether he is a 'presumed father' within the meaning of [Family Code] section 7611." (*Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1050-1051.) Family Code section 7611, subdivision (d) provides that a man is presumed to be the father of a child if he "receives the child into their home and openly holds out the child as their natural child."

" 'The extent to which a father may participate in dependency proceedings and his rights in those proceedings are dependent on his paternal status.' " (*In re Christopher M.* (2003) 113 Cal.App.4th 155, 159.) "Presumed father status ranks highest." (*In re*

*Jerry P.* (2002) 95 Cal.App.4th 793, 801.)  For example, " '[o]nly a statutorily presumed father is entitled to appointed counsel … .' " (*In re Jovanni B.* (2013) 221 Cal.App.4th 1482, 1489 (*Jovanni B.*).)  Additionally, only a presumed father is "entitled to receive reunification services under section 361.5." (*In re Zacharia D.* (1993) 6 Cal.4th 435, 451 (*Zacharia D.*).)  Further, "[o]nly a presumed father is entitled to custody under section 361.2." (*In re E.T.* (2013) 217 Cal.App.4th 426, 437 (*E.T.*).)

"A judgment or order of the superior court is presumed correct.  All intendments and presumptions are indulged to support it on matters as to which the record is silent and error must be affirmatively shown." (*Booth v. Robinson* (1983) 147 Cal.App.3d 371, 377 (*Booth*).)  "A corollary of the presumption of correctness is ' "the doctrine of implied findings," ' which requires ' "the reviewing court [to] infer, following a bench trial, that the trial court impliedly made every factual finding necessary to support its decision." [Citation.]' " (*County of Los Angeles v. Niblett* (2025) 116 Cal.App.5th 454, 463.) Therefore, where findings are not specifically made "it is presumed that the court made such implied findings as will support the judgment." (*Booth*, *supra*, at p. 377.) In this case, the trial court made no explicit finding regarding Father's status as an alleged, biological or presumed father.  However, we presume the court made such implied findings as will support its dispositional findings and orders.  Here, the juvenile court's dispositional findings and orders require a finding of Father's status as presumed father. This is evidenced by the juvenile court's appointment of counsel to represent Father (*Jovanni B.*, *supra*, 221 Cal.App.4th at p. 1489 [only a presumed father is entitled to

12

court appointed counsel]; § 317, subd. (a)(1)), the order granting Father reunification services (§ 361.5; *Zacharia D.*, *supra*, 6 Cal.4th at p. 451 [a mere biological father is not entitled to reunification services under § 361.5]), the court's consideration of Father's request for placement as a noncustodial parent, and the court's order to assess Father's home for possible placement (*E.T.*, *supra*, 217 Cal.App.4th at p. 437 ["Only a presumed father is entitled to custody under section 361.2"].) Therefore, the doctrine of implied findings supports an implied finding that Father is N.J.'s presumed father.

Moreover, the record demonstrates that the parties considered Father to be N.J.'s presumed father. Both DPSS and N.J.'s counsel argued against placing N.J. with Father on the merits and not on the basis that he was not entitled to such placement, and Mother's counsel concurred in that argument. No one argued that N.J. should not be placed with Father because he was not her presumed father, and no one argued that Father is not N.J.'s presumed father. The record supports that finding, given that it is undisputed that Father attended N.J.'s birth, is listed on her birth certificate, and lived with Mother and N.J. for the first year (or thereabouts) of N.J.'s life. (See Fam. Code, § 7611, subd. (d).)

On this record, there is substantial evidence supporting an implied finding that Father is N.J.'s presumed father. (See *Booth*, *supra*, 147 Cal.App.3d at p. 377.) We therefore direct the juvenile court on remand to make an explicit finding of presumed father status to alleviate any confusion regarding Father's rights as a presumed father.

13

B. *Substantial Evidence Supports the Jurisdictional Finding*

Father contends that the section 300(b)(1) jurisdictional finding is not supported by substantial evidence. We disagree.

Section 300(b)(1) authorizes the juvenile court to assert jurisdiction over a child if the court finds by a preponderance of the evidence that "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of" a parent's failure or inability "to adequately supervise or protect the child." (§ 300, subd. (b)(1)(A); *In re Joaquin C.* (2017) 15 Cal.App.5th 537, 561 (*Joaquin C.*).)

The burden is on the agency to establish the following three elements by a preponderance of the evidence: "(1) one or more of the statutorily specified omissions in providing care for the child (inability to protect or supervise the child, the failure of the parent to provide the child with adequate food, clothing, shelter, or medical treatment, or inability to provide regular care for the child due to mental illness, developmental disability or substance abuse); (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*Joaquin C.*, *supra*, 15 Cal.App.5th at p. 561.) We review the juvenile court's jurisdictional findings for substantial evidence. (*In re R.T.* (2017) 3 Cal.5th 622, 633.) We draw all reasonable inferences from the evidence to support the findings and orders and review the record in the light most favorable to the court's determination. (*In re I.J.* (2013) 56 Cal.4th 766, 773.) We do not reweigh the evidence. (*Ibid.*)

Substantial evidence supports the juvenile court's jurisdictional finding under section 300(b)(1).  There is ample evidence that Father failed to protect N.J.  Mother tested positive for methamphetamine and marijuana when Z.P. was born in May 2025.  Father suspected that Mother was using drugs as early as September 2024, after he had already moved out of state leaving N.J. with Mother.  Father told school officials that Mother "was allegedly using drugs" and there had been previous child welfare reports regarding her drug use.  When Father last visited with N.J. in November 2024, he noticed that Mother was "too skinny" and a maternal family member disclosed to him that Mother "was on drugs and doing meth."  Father confirmed that he then knew "the truth" about Mother using drugs.  Despite Father's awareness of Mother's drug usage, he had no contact with Mother or N.J. for around six months.  Father also told DPSS that he "stayed away from" Mother specifically to protect himself, because Mother "was crazy" and he did not "want to risk my well-being, freedom."  Based on this evidence, the juvenile court could reasonably infer that Father did nothing to protect N.J. despite being aware of Mother's drug use and the danger N.J. faced while in Mother's care.  This constitutes substantial evidence that Father failed to protect N.J. from Mother, and the failure to protect placed N.J. at substantial risk of physical harm.

Father's arguments to the contrary are unpersuasive.  Father mischaracterizes the section 300(b)(1) allegation as only including the following "two claims" of Father placing N.J. at substantial risk of harm:  (1) "The first is that [F]ather did not maintain contact with [N.J.]," and (2) "[t]he second allegation of the sustained [section 300(b)(1)]

15

count was that [F]ather failed to provide for [N.J.]." Father ignores the portion of the allegation that Father placed N.J. at substantial risk of harm by "fail[ing] to … provide the child, [N.J.], with adequate … protection." By parsing out this allegation Father misapprehends the importance of a parent's responsibility to also "protect" the child.

C. *Removal Pursuant to Section 361, Subdivision (c)(1), and Not Subdivision (d) was Harmless as Requirements Under Both Provisions Mirror Each Other*

Father contends that the order removing N.J. from his custody under section 361, subdivision (c)(1), should be automatically reversed because the provision only applies to custodial parents and N.J. was not residing with Father when she was removed. DPSS concedes the error but argues that it was harmless because the appropriate statutory provision, subdivision (d) of section 361, imposes the same factfinding requirements and burden. We agree that the error was harmless.

"We normally review an order removing a child from parental custody for substantial evidence viewing the record in the light most favorable to the juvenile court's findings." (*In re Anthony Q.* (2016) 5 Cal.App.5th 336, 344.) "When the issue on appeal involves the interpretation and proper application of the dependency statutes, however, our review is de novo." (*Ibid.*)

Section 361, subdivision (c)(1), provides in pertinent part that a child shall not be taken from the physical custody of a parent "with whom the child resides at the time the petition was initiated," unless the juvenile court makes certain findings by clear and convincing evidence, including that there "would be a substantial danger to the physical

16

health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor" from the parent's custody.

Subdivision (d) of section 361 likewise provides that a "child shall not be taken from the physical custody" of the parent "with whom the child did not reside at the time the petition was initiated" unless the court finds by clear and convincing evidence that (1) "there would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child for the parent … to live with the child or otherwise exercise the parent's … right to physical custody," and (2) "there are no reasonable means by which the child's physical and emotional health can be protected without removing the child" from the parent's custody. (§ 361, subd. (d); Cal. Rules of Court, rule 5.695(c)(2).)

A juvenile court in *In re S.F.* (2023) 91 Cal.App.5th 696, 718-720 (*S.F.*) made a similar error by removing a child from a noncustodial parent under subdivision (c)(1), not subdivision (d), of section 361. Analyzing both provisions, *S.F.* concluded that "any error was harmless, given that both subdivision (c) and subdivision (d) [of section 361] impose the same factfinding requirements and heightened clear and convincing burden of proof for removal." (*S.F.*, *supra*, at p. 720.) We agree with that analysis and conclusion and accordingly conclude that the juvenile court's analysis here under section 361 subdivision (c)(1) rather than subdivision (d) was harmless as both provisions imposed the same factfinding requirements and burden of proof. Father does not dispute that the two

provisions mirror each other, but for their application to custodial versus noncustodial parents, nor does he argue, apart from making conclusory statements, that the findings are unsupported by substantial evidence.

Father does, however, contend that "[t]he removal order should also be reversed for the reasons that [DPSS] did not establish i[t] made reasonable efforts to avoid removing [N.J.] from the custody of her father." Section 361, subdivision (e), provides: "The court shall make a determination as to whether reasonable efforts were made to prevent or to eliminate the need for *removal of the minor from their home.*" (Italics added.) Section 361, subdivision (e), thus only applies when a minor is removed from "their home." N.J. did not live with Father when the petition was initiated, so Father's home was not N.J.'s home. Section 361, subdivision (e), accordingly did not apply to the removal of N.J. from Father. For that reason, we find Father's argument meritless and reject his challenge to the removal order on this basis.

D. *Substantial Evidence Supports Detriment Finding*

Father contends that there is insufficient evidence supporting the juvenile court's finding under section 361.2, subdivision (a) (section 361.2(a)) that it would be detrimental to place N.J. with him. We disagree.

Section 361.2(a) requires a court ordering removal of a child to first determine whether there is a noncustodial parent who wants "to assume custody of the child." Under section 361.2(a), "the court shall place the child with that parent unless it finds that placement with the parent would be detrimental to the safety, protection, or physical or

18

emotional well-being of the child."  The juvenile court must find that it would be detrimental to place the child with a noncustodial parent by clear and convincing evidence.  (*In re Patrick S.* (2013) 218 Cal.App.4th 1254, 1262; *In re A.C.* (2020) 54 Cal.App.5th 38, 43 (*A.C.*).)

In analyzing whether placement with a noncustodial parent would be detrimental to the child, the juvenile court " 'weighs all relevant factors to determine if the child will suffer net harm' " as described in section 361.2(a).  (*In re A.T.* (2025) 110 Cal.App.5th 722, 736; *A.C.*, *supra*, 54 Cal.App.5th at p. 43.)  Such factors may include the child's wishes, sibling bonds, and the child's relationship with the noncustodial parent.  (*In re C.M.* (2014) 232 Cal.App.4th 1394, 1402 (*C.M.*).)  Under section 361.2(a), "a detriment finding can properly be supported by the emotional harm arising from the loss of sibling relationships even in the absence of the noncustodial parent's contribution to the detriment."  (*In re Luke M*. (2003) 107 Cal.App.4th 1412, 1425 *(Luke M.*).)

"We review the record in the light most favorable to the court's order [under section 361.2(a)] to determine whether there is substantial evidence from which a reasonable trier of fact could find clear and convincing evidence that the children would suffer such detriment."  (*Luke M.*, *supra*, 107 Cal.App.4th at p. 1426; see *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.)  "Clear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt."  (*Luke M.*, at p. 1426.)

The juvenile court based its detriment finding on N.J.'s bond with her siblings and the emotional harm she would suffer from being separated from them and being placed in Father's home in another state. The record amply supports the juvenile court's finding that there was a high probability that moving N.J. out of state would cause the two and one-half-year-old great emotional harm. There is strong evidence that N.J. developed a deep emotional bond with her half sisters Am.B. and Ar.B., with whom N.J. had been placed. Both the caregiver and the social worker confirmed that N.J. was "very" closely bonded with Am.B. and Ar.B. The caregiver reported that N.J. cried if Ar.B. and Am.B. left the room. The social worker also witnessed such an incident and described N.J. as "emotionally upset" when Ar.B and Am.B. left the room. Thirteen-year-old Ar.B. considered two-year-old N.J. to be "her baby" and she reportedly took care of N.J. Ar.B. said that N.J. would occasionally crawl into her bed at night. This constitutes substantial evidence supporting the juvenile court's finding that N.J. would suffer detriment if she was moved out of state with her estranged Father. (*Luke M.*, *supra*, 107 Cal.App.4th at pp. 1425-1427.)

Father's reliance on *C.M., supra*, 232 Cal.App.4th 1394, which turns on different facts, is inapposite. In *C.M.*, the juvenile court found detriment in placing C.M. with her nonoffending, noncustodial father who provided financial support and maintained a relationship with his child C.M. including frequent telephone calls, weekend visits, and unmonitored visits for holidays, which C.M. enjoyed and her therapist encouraged. (*Id.* at pp. 1396-1397.) The father was willing to have C.M.'s half sibling live with him

also to salvage the bond between C.M. and the half sibling. (*Id.* at p. 1398.) In reversing the juvenile court's finding, the Court of Appeal reasoned that C.M.'s "understandable wish to remain with her maternal grandparents in the only home she had ever known," "the alleged lack of an established relationship with father," the bond between the child and her half sibling, and the fact that the child "would be in stepmother's care much of the time because of father's work schedule" were insufficient to constitute "substantial evidence of the high level of detriment required under section 361.2(a)." (*Id.* at p. 1403.) Conversely, as already described, the case here evidences an estranged relationship between Father and N.J. and demonstrates that forcibly fracturing the bond between N.J. and her half sisters by placing N.J. out of state with Father will have serious emotional consequences.

E.    *ICWA*

"In 1978, Congress enacted the [ICWA] to 'formalize[] federal policy relating to the placement of Indian children outside the family home.' [Citation.] Under ICWA's state analogue statutes (Cal-ICWA; [§ 224 et seq.]), courts and child welfare agencies are charged with " 'an affirmative and continuing duty to inquire whether a child … is or may be an Indian child' in dependency cases. [Citation.] Child welfare agencies discharge this state law duty by 'asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled.' " (*In re Dezi C.*

21

(2024) 16 Cal.5th 1112, 1124-1125 (*Dezi C.*), fn. omitted; accord *In re Kenneth D.* (2024) 16 Cal.5th 1087, 1099.)

"Agencies and juvenile courts have 'an affirmative and continuing duty' in every dependency proceeding to determine whether ICWA applies by inquiring whether a child is or may be an Indian child." (*Dezi C.*, *supra*, 16 Cal.5th at pp. 1131-1332.) The duty is composed of two phases—a duty of initial inquiry and the duty of further inquiry. (§ 224.2, subds. (b), (c), (e); *In re Ja.O.* (2025) 18 Cal.5th 271, 277; *Dezi C.*, at pp. 1132-1133.) The child welfare agency's duty to inquire begins when the agency is "first contacted regarding a child." (§ 224.2, subd. (b)(1).) The agency must ask the "party reporting child abuse or neglect whether the party has any information that the child may be an Indian child," and the agency must ask the child and the child's family members, including statutorily specified extended family members, upon first contact with those individuals. (*Ibid.*) " 'Extended family member[s]' " include adults who are the child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent. (§ 224.1, subd. (c)(1).) This case only involves the duty of initial inquiry.

"The juvenile court's factual finding that ICWA does not apply is 'subject to reversal based on sufficiency of the evidence.' " (*Dezi C.*, *supra*, 16 Cal.5th at p. 1134.) The "court's fact-specific determination that an inquiry is adequate, proper, and duly diligent is 'a quintessentially discretionary function.' " (*Id.* at p. 1141.) " ' "On a well-developed record, the court has relatively broad discretion to determine whether the

agency's inquiry was proper, adequate, and duly diligent on the specific facts of the case. However, the less developed the record, the more limited that discretion necessarily becomes." ' " (*Ibid.*) "If, upon review, a juvenile court's findings that an inquiry was adequate and proper and ICWA does not apply are found to be supported by sufficient evidence and record documentation as required by California law [citation], there is no error and conditional reversal would not be warranted even if the agency did not inquire of everyone who has an interest in the child. On the other hand, if the inquiry is inadequate, conditional reversal [of an order terminating parental rights] is required so the agency can cure the error and thereby safeguard the rights of tribes, parents, and the child." (*Ibid.*) But in an appeal from disposition, ICWA inquiry error does not require reversal of the dispositional findings and orders other than the ICWA finding itself. (*In re Dominick D.* (2002) 82 Cal.App.5th 560, 567.)

Reversal is not required "in all cases in which every possible extended family member has not been asked about the child's Indian ancestry." (*Dezi C.*, *supra*, 16 Cal.5th at p. 1140.) "[S]ection 224.2 'does not require the agency to "find" unknown relatives and others who have an interest in the child, merely to make reasonable inquiries. The operative concept is those people who are reasonably available to help the agency with its investigation.' " (*Ibid.*; *In re H.B.* (2023) 92 Cal.App.5th 711, 720 [" '[W]e cannot ask the [Department] to intuit the names of unidentified family members or to interview individuals for whom no contact information has been provided' "].)

23

Here, Father argues that DPSS failed to discharge its duty of initial inquiry by asking the paternal grandmother, the paternal uncle, and maternal aunt about possible Indian ancestry. [2] DPSS concedes, and the record confirms, that no inquiry was made of these extended relatives who were reasonably available and who fall within the statutory definition of extended family members under section 224.1, subdivision (c)(1). Maternal aunt was present when DPSS interviewed Mother at the hospital after Z.P.'s birth, and Father lived with the paternal grandmother and the paternal uncle. By not asking those reasonably available extended relatives about possible Indian ancestry, DPSS failed to discharge its initial duty of inquiry.

Father also argues that DPSS failed to discharge its duty of inquiry by not: (1) asking the parents whether there were any other possible extended family members who might have relevant information, or (2) inquiring of other extended family members whose contact information DPSS did not have, such as Mother's other siblings and the maternal grandfather. In response, DPSS argues that the record does not show that DPSS or the court had contact with these additional individuals.

Here, the record is unclear as to whether DPSS complied with its inquiry obligations under ICWA. The record does demonstrate that Mother told DPSS she had three older sisters, one younger sister, and a brother from her father, and that her biological father was frequently in jail. (Italics omitted.) However, it is unclear whether

_____

[2] Father's opening brief alleges that he advised a DPSS social worker that N.J.'s paternal aunt was also present in his home, however, the record does not evidence that Father reported living with a paternal aunt.

24

Mother, or Father, identified or provided contact information regarding extended relatives who might have relevant information regarding potential Indian ancestry and whether DPSS made reasonable inquiry regarding known relatives.

As such, the record does not contain sufficient evidence to support the juvenile court's finding that DPSS conducted an adequate and proper ICWA inquiry. DPSS failed to ask certain reasonably available extended relatives including the maternal aunt, the paternal grandmother, and the paternal uncle about possible Indian ancestry. As DPSS concedes, it failed its duty of inquiry and the court's finding that ICWA did not apply is not supported by sufficient evidence.

## III.

## DISPOSITION

The finding that ICWA does not apply is vacated and the matter is remanded for the juvenile court to ensure compliance with the inquiry obligations under ICWA and related California law.  We also direct the juvenile court on remand to make an express finding that Father (A.J.) is N.J.'s presumed father.  In all other respects, the jurisdictional and dispositional findings and orders are affirmed.

CERTIFIED FOR PARTIAL PUBLICATION

LEE
J.

We concur:

CODRINGTON
Acting P. J.
MENETREZ
J.

26